```
 1                IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2                         OAKLAND DIVISION
```

| | | |
|---|---|---|
| 3 | In Re: | ) **Case No. 09-41727 J** |
| | | ) Chapter 11 |
| 4 | A.F. EVANS COMPANY, INC., | ) |
| | | ) |
| 5 | Debtor. | ) Oakland, California |
| | | ) Thursday, July 2, 2009 |
| 6 | | ) 2:30 p.m. Calendar |
| | | ) |
| 7 | | ) 1.   MOTION OF CITY NATIONAL |
| | | ) BANK FOR ORDER REQUIRING |
| 8 | | ) DEBTOR TO REMIT SALE PROCEEDS |
| | | ) OF COLLATERAL |
| 9 | | ) |
| | | ) 2.   STATUS CONFERENCE ON |
| 10 | | ) MOTION TO SELL AND ASSIGN |
| | | ) PARTNERSHIP INTEREST |
| 11 | _____ | ) |

```
12                    TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE EDWARD D. JELLEN,
13                 UNITED STATES BANKRUPTCY JUDGE.

14   APPEARANCES:

15   For the Official Committee    Pamela E. Singer
     of Unsecured Creditors:       PACHULSKI STANG ZIEHL & JONES
16                                 150 California Street, 15th Floor
                                   San Francisco, CA 94111-4500
17                                 (415) 263-7000

18   For City National Bank:       Frank Pepler
                                   T. Scott Bucey
19                                 PEPLER MASTROMONACO, LLP
                                   100 First Street, 25th Floor
20                                 San Francisco, CA  94105
                                   (415) 978-9860
21
     For the Alliant Parties:      Margaret M. Mann
22                                 SHEPPARD MULLIN RICHTER &
                                     HAMPTON, LLP
23                                 501 W. Broadway, 19th Floor
                                   San Diego, CA  92101-3598
24                                 (619) 338-6500

25
```

```
 1  APPEARANCES, cont'd.:

 2  For the U.S. Trustee:         Barbara A. Matthews
                                  ASSISTANT UNITED STATES TRUSTEE
 3                                1301 Clay Street, Suite 690N
                                  Oakland, CA  94104
 4                                (510) 637-3206

 5  For the Debtor:               Chris D. Kuhner
                                  Eric A. Nyberg
 6                                KORNFIELD NYBERG BENDES &
                                     KUHNER, PC
 7                                Lake Merritt Plaza
                                  1999 Harrison Street, Suite 2675
 8                                Oakland, CA  94612
                                  (510) 763-1000
 9
    For the Official Committee    Maxim B. Litvak
10  of Unsecured Creditors:       PACHULSKI STANG ZIEHL & JONES
    (Via Telephone)               150 California Street, 15th Floor
11                                San Francisco, CA 94111-4500
                                  (415) 217-5110
12
    For CP III Evans, LLC:        Alan M. Feld
13  (Via Telephone)               Robert Sherman
                                  MANATT PHELPS & PHILLIPS
14                                11355 W. Olympic Boulevard
                                  Los Angeles, CA  90064
15                                (310) 312-4153

16  Electronic Court              Amber Counts
    Recorder:                     United States Bankruptcy Court
17                                P.O. Box 2070
                                  Oakland, CA  94604-2070
18                                (510) 879-3568

19  Transcription Service:        Kathy Rehling
                                  209 Bay Circle
20                                Coppell, TX  75019
                                  (972) 304-1998
21

22

23

24
         Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.
```

1  OAKLAND, CALIFORNIA - JULY 2, 2009 - 2:44 P.M.

2  THE COURT: Matter of A.F. Evans Company.

3  MS. SINGER: Good afternoon, Your Honor. Pamela

4  Singer of Pachulski Stang Ziehl & Jones on behalf of the

5  Official Committee of Unsecured Creditors.

6  THE COURT: Okay.

7  MR. PEPLER: Good afternoon, Your Honor. Frank

8  Pepler appearing on behalf of City National Bank. And Scott

9  Bucey of my office is also in court.

10  THE COURT: Okay. Thank you.

11  MS. MANN: Good afternoon, Your Honor. Margaret

12  Mann of Sheppard Mullin Richter & Hampton appearing on behalf

13  of the Alliant parties.

14  THE COURT: Okay. Thank you.

15  MS. MATTHEWS: Good afternoon, Your Honor. Barbara

16  Matthews appearing on behalf of the United States Trustee.

17  MR. KUHNER: Good afternoon, Your Honor. Chris

18  Kuhner and Eric Nyberg on behalf of the Debtor.

19  THE COURT: All right. Let's see. I have two

20  things on the calendar. One is a status conference on the

21  motion to sell, where the presumed intention, at least at

22  this end, is to set an evidentiary hearing. And I would

23  appreciate guidance from the parties as to how much time I

24  need to set aside and when that hearing should be. And then

25  we have a motion by City National concerning the sale

1  proceeds.

2      MS. SINGER: Your Honor, excuse me for interrupting.

3  Pam Singer. I wanted to point out that Max Litvak has also

4  appeared on behalf of the Committee and is on the phone.

5      THE COURT: Oh, thank you, Ms. Singer. Is Mr.

6  Litvak available by phone, Ms. --

7      MR. LITVAK: I am on the line, Your Honor. I hope

8  you can hear me.

9      THE COURT: I can hear you, Mr. Litvak. I didn't

10  mean to overlook you. So your appearance is noted. Thank

11  you for correcting me, Ms. Singer.

12      MS. SINGER: You're welcome, Your Honor.

13      THE COURT: All right.

14      MR. FELD: Your Honor, it's also Alan Feld and Rob

15  Sherman of Manatt Phelps on the phone for secured creditor CP

16  III.

17      THE COURT: Oh, okay. Mr. Feld and Mr. Sherman.

18  Thank you both.

19      MR. FELD: Okay. Thank you.

20      MR. KUHNER: Thank you, Your Honor. Chris Kuhner.

21      In addition to those two matters, Your Honor, at the end

22  of the hearings today we'd like to discuss a proposed

23  stipulation for continued use of cash collateral. We've

24  entered into sort of a stopgap --

25      THE COURT: All right.

1      MR. KUHNER:  -- to -- or, a 17-day stipulation to
2  use cash collateral.  We'll bring that up at the end, Your
3  Honor.

4      THE COURT:  All right.

5      MR. KUHNER:  As to the status conference, Ms. Mann
6  and myself have been discussing a potential -- a schedule.  I
7  think we've agreed to a timeline, and assuming it works with
8  Your Honor, we would like to have a hearing date -- I'll work
9  backwards -- sometime in the middle of August.

10      THE COURT:  How much time for the hearing?

11      MR. KUHNER:  I think about a half a day.  We
12  anticipate three witnesses, maybe four, from the Debtor at
13  the most.  Not very long.  And we would do direct testimony
14  through declarations.

15      MS. MANN:  Your Honor, I anticipate an equal number
16  of witnesses.  My experience is --

17      THE COURT:  Eight witnesses in a half a day --

18      MS. MANN:  I was just going to say that.

19      (Laughter.)

20      MS. MANN:  Despite discussions with counsel about
21  making this as expedited as possible, I think two days would
22  be safer as well as more convenient.  And obviously we don't
23  need to use the second day if we don't need to use it.

24      THE COURT:  Yes.  The issues here basically have to
25  do with the authority and discretion, if any, of the proposed

6

1  new partner. I just can't see how it could take two days.

2  MS. MANN: Your Honor, --

3  MR. KUHNER: I think one day would be fine.

4  MS. MANN: Your Honor, my concern is there are two

5  issues here. You know, there's the identity of the partner,

6  as Your Honor identified in the memorandum. But we also have

7  the evidence of cure and whether that's sufficient. And so

8  it's because of both issues that I think we should reserve

9  the two days.

10  THE COURT: What are the factual issues on the cure?

11  What kind of evidence am I going to be hearing about?

12  MS. MANN: Your Honor, we have not seen a revised --

13  I understand that there's -- the Debtor's intention is to

14  enter into a revised sale agreement with Reliant that may

15  address some of the issues that we have regarding whether

16  this is a breaking-away of the benefits of the partnership

17  away from the obligation. So there's also a number of issues

18  with regard to the management agreement and those

19  responsibilities and whether the proposal is consistent with

20  the partnership agreement.

21  So it really is about the -- not only the natures of the

22  duties left under this agreement, but how exactly this deal

23  intends to satisfy those responsibilities so as to comport

24  with the provisions of the Code.

25  THE COURT: And this is in August?

1         MR. KUHNER: Yes, Your Honor.

2         THE COURT: Madam Deputy, what do we have in August?

3 I can't believe this would take two days for the Debtor to

4 put on adequate assurance of cure, if the evidence exists.

5 Or of future performance, I should say. And --

6         MR. KUHNER: We don't think it will take more than a

7 day, Your Honor.

8         THE COURT: Well, let's set a day. I think the

9 parties can do this in a day. I don't want to -- and then as

10 far as the duties of the proposed assignee and whether this

11 comes within the category of discretionary/important or just

12 basically an entity whose skills and intentions aren't very

13 relevant, well, that shouldn't take two days. Madam Deputy,

14 let's find a day.

15         THE CLERK: Yes, Your Honor. August 11 at 10:00

16 a.m.

17         MS. MANN: Your Honor, just a little more clarity

18 here. This is a tax credit partnership with some very

19 complex regulations that apply, both on a local level and on

20 the federal level. And it may be that there are -- we need

21 an expert witness to help explain them. I haven't -- without

22 knowing what the adequate assurance is yet, --

23         THE COURT: Let's not blow this up into a

24 thermonuclear war. You know, I mean, if I said let's set

25 aside two months, some attorneys would say, "Give me three

1  months." I mean, we can do this in a day. I'm sure, with
2  intelligent, smart lawyering that prudently use their time
3  and their witnesses to get to the nugget of the issue, that a
4  day should work.

5      So Madam Deputy, can we find a day?

6          THE CLERK: Yes, Your Honor. August 11 at 10:00
7  a.m.

8          MR. KUHNER: That's fine with me, Your Honor.

9          THE COURT: All right.

10         MS. MANN: That's fine, Your Honor.

11         THE COURT: Why don't we start at 9:30? That'll
12  give you a little extra. You get an extra half hour already.
13  All right. So, 9:30 on August 11.

14         MR. KUHNER: And what --

15         THE COURT: And then --

16         MR. KUHNER: I'm sorry.

17         THE COURT: -- I would like the parties to file and
18  serve trial briefs seven days before that.

19         MS. MANN: Okay.

20         THE COURT: File and serve witness lists seven days
21  before that. You don't need to go into detail about what the
22  witness is going to say, but if the identity of the witness
23  is not someone known to the other side, just a brief
24  description: "The witness is the proposed general partner"
25  or "The witness is someone who drafted some document who was

9

1 instructed to say such-and-such." Just, you know, a one-line
2 or two-liner to identify the person.

3     And then, finally, any documents to come into evidence
4 are to be exchanged -- you don't need to file them --
5 exchanged seven days before the trial. I will issue a
6 scheduling order concerning the pre-marking of documents and
7 that sort of thing.

8         MS. MANN: Your Honor, we actually had talked about
9 moving those dates back a little in case there is a need for
10 discovery on either side. Is that possible?

11         THE COURT: Sure. Anything's possible when you're
12 talking about a day.

13         MR. KUHNER: I think we're -- this is what gets
14 filed with the Court. We discussed, just between the two of
15 us, to exchange documents --

16         MS. MANN: And actually, on July 13.

17         MR. KUHNER: Discovery.

18         THE COURT: All right.

19         MR. KUHNER: So I don't think that needs to change
20 the Court's schedule in terms of when we file.

21         THE COURT: Is that okay? Leave it July -- August
22 11th?

23         MS. MANN: Yeah. We can work with the Court's
24 schedule. I just wanted --

25         THE COURT: Okay.

10

1      MS. MANN:  I was a little confused about whether our
2   --
3          THE COURT:  All right.
4      MS. MANN:  -- previous schedule had been overruled.
5   But Mr. Kuhner --
6          THE COURT:  No, no.  Your previous is not overruled.
7          MR. KUHNER:  Right.
8          THE COURT:  So, in fact, why don't I ask, Mr.
9   Kuhner, could you get a copy of my form scheduling order and
10  modify it as you will, in cooperation with opposing counsel?
11  In other words, the two parties can play with it and put in
12  whatever dates you want, except for August 11th at 9:30, one
13  day.  That stays.  You can do whatever else you want with it.
14  Okay?
15         MR. KUHNER:  And just --
16         MS. MANN:  Right.
17         MR. KUHNER:  Just for the record, for Ms. Mann's
18  comfort, we are -- we have agreed to -- the parties will
19  exchange names of witnesses as well as documents that we
20  believe are relevant by July 13, 2009.
21         THE COURT:  All right.  Yes.  Ignore any deadlines
22  or dates I gave you other than the date of the trial and the
23  time.  Fill in whatever you like.  July 13 happens to be my
24  birthday, so maybe you'll have a good time exchanging
25  documents by that date.

1    (Laughter.)

2         MS. MANN:  Thank you, Your Honor.

3         MR. KUHNER:  Thank you, Your Honor.

4         THE COURT:  All right.  Thank you both.

5    Anything else on the evidentiary hearing?

6    (No response.)

7         THE COURT:  All right.  That brings us, then, to the

8    motion to remit the sale proceeds.  I guess my first question

9    is, are there sales proceeds to remit?

10        MR. PEPLER:  Your Honor, Frank Pepler appearing on

11   behalf of City National.  There are not sale proceeds, but

12   I've gotten a request for a partial release in connection

13   with the Plaza sale.  It's scheduled to close on Tuesday.

14        THE COURT:  The sale will close on Tuesday?

15        MR. PEPLER:  And there will be $1.44 million of

16   gross sale proceeds, of which, under the cash collateral

17   agreement, we get --

18        THE COURT:  All right.

19        MR. PEPLER:  -- 87-1/2 percent.

20        THE COURT:  So if I didn't want to issue an advisory

21   committee, I should wait till after Tuesday and let someone

22   advise me that there's some sales proceeds for me to opine

23   about?  Is that --

24        MR. PEPLER:  Well, since the Committee is

25   threatening to also bring an adversary proceeding against us

1   on the same theories it's advancing in its opposition to the
2   sale motion, --

3         THE COURT: But adversary proceeding motion. I
4   can't render an opinion about disposing of proceeds that are
5   nonexistent. I mean, so once the sale closes, then, you
6   know, we can deal with who gets them. But I guess I
7   shouldn't be issuing any rulings until I know that there are
8   some sale proceeds to talk about.

9         MS. SINGER: Your Honor, Pam Singer. That's the
10  Committee's initial point.

11        THE COURT: Yes. I mean, I'll hear what people have
12  to say, and if someone just sends me a fax saying, "The sale
13  closed and now you can issue a ruling," that's fine with me.
14      All right. Mr. Pepler, I have read your papers. I've
15  also read the opposition. Anything you want to clarify or
16  respond to? Otherwise, I think I have a handle on it.

17        MR. PEPLER: No, I'm sure that you do, Your Honor.
18  The only thing that I would note is that the Committee's
19  brief omits any discussion of the relevant provision of the
20  UCC which governs post-revised Article IX terminations,
21  amendments and financing statements.

22        THE COURT: 9510(a) is the section in the --
23        MR. PEPLER: That is the one. It's one of our
24  favorites. I'm sure you're aware of it.

25      Other than that, I feel confident that --

1       THE COURT:  I'll give you a chance to respond to
2   anything Ms. Singer has to say, if she's going to argue it.
3       Ms. Singer, my question for you, and you can -- again,
4   I've read your papers.  If I understand the facts correctly
5   here, prior to the filing of the petition -- the petition I
6   have was filed on March 5, '09.  And a corrective UCC-3 was
7   filed on February 6, '09.  So, as of the date of the
8   petition, even assuming, arguendo, that the termination
9   statement went into effect, it seemed like at the date of the
10  petition everything was corrected.  So what is your basis for
11  complaint, even assuming, just for sake of discussion, that
12  prior to the corrective statement being filed there was a
13  problem from the bank's standpoint?

14      MS. SINGER:  The basis for our objection is the
15  Ninth Circuit's decision in *Pacific Trencher*, where, under
16  nearly identical -- under identical facts, and a corrective
17  statement in *Pacific Trencher* was also filed, the court found
18  that once the termination box is terminated, the security
19  interest is terminated.  And the corrective statement, it
20  doesn't -- isn't sufficient to -- it doesn't change that
21  fact.  And in *Pacific Trencher*, the issue was reserved as to
22  whether or not that corrective statement was really the
23  creation of a security interest within 90 days.

24      THE COURT:  The perfection of a security interest,
25  you mean?

14

1       MS. SINGER: Yeah, the perfection of the security
2   interest within the 90 days. So the basis for our decision,
3   Your Honor, is *Pacific Trencher*.

4       THE COURT: But was Section 9510(a) in effect at
5   that time? At the time of *Pacific Trencher*, I mean?

6       MS. SINGER: Oh, nine five -- let me pull it up.

7       THE COURT: That's the section that says a filing is
8   ineffective to the extent that it's not authorized. I'm
9   overparaphrasing.

10      MS. SINGER: No, that was not in effect when --
11      THE COURT: Yes.

12      MS. SINGER: -- *Pacific Trencher* was passed. But
13  what -- and as we have in the briefs, what the official
14  comment makes clear is that -- the entire issue of who has
15  authority to file a financial statement, and in order for a
16  financial statement to be effective it has to be filed with
17  authority. Authority is decided by law outside of the UCC.

18      THE COURT: But here we have documents that tell us
19  what the authority was. The authority was to file a UCC-3
20  that didn't terminate but just merely scaled back the scope
21  of perfection. That's the evidence I have in front of me as
22  to what the authority was.

23      MS. SINGER: Well, what --

24      THE COURT: And my other -- let me --

25      MS. SINGER: Uh-huh.

15

1         THE COURT: The other thing here, if you look at the
2 statement that was actually filed, yes, the termination box
3 was filed, but the textual part referred not to a
4 termination, saying, "This security interest is gone. Bye-
5 bye, baby. No more security interest." It said that it was
6 being pared back. So anybody looking at that would know that
7 the intent wasn't to throw it out completely but to limit it,
8 right on the face of it.

9         MS. SINGER: Well, Your Honor, there's a safe harbor
10 in the UCC for mistakes, and I think that's what the Court is
11 alluding to, is that some mistakes just seem minor and --

12         THE COURT: And also alluding to *Pacific Trencher*,
13 which didn't have that fact.

14         MS. SINGER: Well, it did have that fact. In
15 *Pacific Trencher*, Your Honor, there was a listing of the
16 collateral exactly like in our case. And the court found
17 that the safe harbor of minor errors doesn't apply.

18    And let me just back up a little bit. We don't know what
19 the facts are, Your Honor. And the issue cannot be decided
20 in a contested matter on a motion. There does have to be an
21 adversary proceeding. But the Committee has chosen not to
22 bring that adversary proceeding until there are proceeds to
23 fight about. And we have heard that there's going to be
24 closing after closing, and we prudently have decided to wait
25 until there is something to really fight about.

1   So -- and the issue -- under Revised Article IX,
2   authority is decided by agency law. Now, we don't know
3   whether First American filed this or -- we really don't know
4   whether even City National Bank -- who checked that box. It
5   could be that one of the administrative assistants at CNB
6   checked that box. And Your Honor, if this were entirely in-
7   house, if this had gone from the business person to the legal
8   department to the paralegal to the filing clerk, and
9   somewhere along that chain the termination box had been
10  mistakenly checked, we wouldn't be here, because *Pacific*
11  *Trencher* has not been abrogated by the UCC and it's a
12  seriously misleading mistake.

13      There is a possibility of an agency issue here in that
14  First American was told -- and City National Bank does say
15  that First American was its agent for filing appropriate
16  amendments. And somewhere along the line, the termination
17  box got checked. Was checking that termination box within
18  the scope of that agency to file an appropriate amendment?
19  Under the UCC, a termination statement is defined as many
20  things. It's a UCC-3 statement, and it includes an
21  amendment. So accidentally -- it's 10278. So accidentally
22  checking the termination box doesn't automatically take the
23  filing outside the scope of filing appropriate amendments.
24  But as well, when an agent is asked to do something -- file
25  appropriate amendments; don't screw it up; don't make a

1 mistake -- if in the course of doing what they were told to
2 do -- file the UCC-3 statement -- they make a mistake, the
3 cases are crystal clear that mistakes don't take the action
4 outside the scope of the agency.

5 The *Goddard* case that we filed is very clear on that,
6 where the principal -- very briefly, the principal told a
7 person, "Go lend some money and get a security interest."
8 And the agent lent some money but forgot to get the security
9 interest. And the principal sued him and said, "You
10 basically stole my money." Sued him for conversion. And the
11 court said, "Well, it wasn't conversion. You gave it to him
12 as part of an agency. And yes, he made a mistake, but it was
13 still within the scope of the agency."

14 And the *Morrow Crane* case, where the principal told the
15 agent, "Put the crane on a boat and ship it. And don't put
16 it above, because I don't want it getting rusty. Put it
17 below." And the agent made a deal with the shipper and it
18 wound up above and it got rusty. And the court said, "Well,
19 you know." And the issue was, was that within the scope of
20 the agency? And the court said yes, because mistakes within
21 the scope of the agency are binding. Otherwise, Your Honor,
22 the exception would swallow the rule and the principal would
23 always say, "Well, that was a mistake" or "He didn't follow
24 my directions, and therefore I'm not bound."

25 And one of CNB's cases, it was exactly that, where the

18

1 | principal said, "Well, those weren't the directions." And
2 | the court said, "Well, even if it weren't the directions,
3 | you're still bound."

4 | So agency law, to the extent it applies at all given the
5 | facts, and we don't know the facts, it was within the scope
6 | of the agency.

7 | So then the UCC, we come back to the UCC, and the UCC
8 | determines the consequence of that mistake. And it has a
9 | safe harbor for minor errors. But *Pacific Trencher* has
10 | already said, under identical facts, when the termination box
11 | is checked by mistake, even when the collateral to be
12 | released is listed, even when a corrective statement is
13 | filed, that is a -- seriously misleading, and the safe
14 | harbor, unfortunately, is not available. So, Your Honor,
15 | it's not available here.

16 | THE COURT: All right. Thank you, Ms. Singer.
17 | MS. SINGER: You're welcome.
18 | THE COURT: Mr. Pepler, I said you could respond.
19 | MR. PEPLER: I will try to be brief, Your Honor.
20 | Though I've spent a lot of time around the UCC -- I was an
21 | observer to the National Conference of Commissioners on
22 | Uniform State Laws when --

23 | THE COURT: All right. But this isn't about you,
24 | Mr. Pepler, so it's --
25 | (Laughter.)

1          MR. PEPLER:  I have tried to bring a reasonableness
2  to this discussion, and I have been met with what I think is
3  resistance by the Committee that is completely unprincipled.

4       The scope of the agency in this case couldn't be more
5  clearly delineated than it is in the escrow instructions.
6  The Committee chooses to read and to recite half of one
7  sentence in describing that City National Bank authorized the
8  filing of appropriate statements.  They of course omit to
9  refer to what Your Honor doubtless has read, that the scope
10  of that agency is limited to release of the collateral
11  specified.

12      The law is completely different than it was when *Pacific*
13  *Trencher* was decided, by the simple fact that revised Article
14  IX eliminated the requirement of physical signatures to prove
15  authority.  You can file a financing statement without
16  signature.  You can file a termination statement without
17  signature.  That's why 9510(a) exists, because the test for
18  determining whether a financing statement is effective is
19  whether it was authorized.  And then it is only effective to
20  the extent that it was authorized.  That's true whether it's
21  an original filing or whether it's an amendment which
22  terminates or releases collateral.

23      Then the Secretary of State keeps what the drafters refer
24  to as an 'open drawer' of these financing statements, and
25  people can look at the dialogue between the parties filing

1   financing statements and determine the scope of the remaining
2   effectiveness of the filing. Completely different than in
3   *Pacific Trencher*, where the rule was and the practice was, if
4   there was a termination statement filed, the Secretary of
5   State purged the files. The case says that in the discussion
6   of the effect of a termination statement. Never happens any
7   more. Instead, what happens is that the financing statement
8   and any linked documents get filed with the Secretary of
9   State. Subsequent searchers can make their own conclusions.
10  The standard of material error remains the same, but the
11  facts that are brought to bear on that are different.

12      So, in this case, we think that the record before Your
13  Honor supports a finding that there could not have been any
14  material misleading effect of the financing statement which
15  was delivered to release collateral. And I don't think it
16  matters who in the chain between the secretaries at CNB and
17  the title company may have checked this box. It wasn't
18  within the express scope of the authority granted by the
19  secured party to file the amendment.

20          THE COURT: Assume, contrary to your argument, that
21  CNB is bound by the error of checking the thing, and talk
22  about the seriously misleading error in light of *Pacific*
23  *Trencher*. Ms. Singer argues that *Pacific Trencher* holds that
24  the fact that you have the collateral delineated in the text
25  box is irrelevant once the termination box is checked.

1        MR. PEPLER: Right. And the clear distinguishing
2  fact which the Committee doesn't focus on is that, in *Pacific*
3  *Trencher*, there was only one box checked. It was the
4  termination. And under that there was a description of
5  collateral. In our case, there was a deletion of collateral
6  box checked when CNB sent the financing statement in, and
7  when it was filed, both the termination box and the deletion
8  of collateral box were checked.

9    So what the secured party in *Pacific Trencher* needed to
10  argue was, notwithstanding the clear expression of an intent
11  to terminate in a system where it was an on-off switch -- you
12  were either continued effective filing or terminated -- that
13  it had saved itself by filing a description of collateral to
14  be released. And then when they filed their subsequent
15  filing, I think Ms. Singer is a little off on the law,
16  because they didn't file a corrective statement. They didn't
17  exist. They re-perfected within the preference period by
18  filing a new UCC-1.

19    So, in our case, the financing statement continued
20  effective notwithstanding the amendment, and it could not be
21  seriously misleading because on its face there was both a
22  deletion of collateral box and a termination box. Under the
23  current system, that remains in the Secretary of State files,
24  and if there is a concern on the behalf of -- or on behalf of
25  subsequent searchers, all they need do is call the secured

1 party to determine whether the financing statement was
2 terminated or collateral was deleted from the blanket
3 description.

4     So I think that the -- both the rule and the system that
5 the rule applied are different now than they were in 1974.

6         THE COURT: All right. Thank you.

7         MS. SINGER: Your Honor, may I just add something
8 very brief?

9         THE COURT: Yes, you may, but I'll let opposing
10 counsel respond to it. But go ahead.

11         MS. SINGER: Okay. I just want to point out that
12 under the new Article IX, the official comments to Section
13 9509 are crystal clear that law under this -- law other than
14 this article, including the law with respect to whether a
15 person has the requisite authority, will -- so -- so the
16 whole notion of whether or not a party has authority hasn't
17 been -- the cases that we're relying on remain relevant.

18     And the statute that *Pacific Trencher* relied on, the only
19 difference between *Pacific Trencher*, Your Honor, and this
20 case is that an extra box in *Pacific Trencher* was checked.
21 And that is not going to -- if anything, it's even more
22 confusing in this case, what happened.

23     But it relied on -- the statute that was simply
24 renumbered under Revised IX, there was an intent -- that
25 statute on which *Pacific Trencher* relies, 9506, is in Article

1  IX.  It just was renumbered.

2       THE COURT:  Okay.

3       MS. SINGER:  And finally, Mr. Pepler says, "Someone
4  could have just called us and then they wouldn't be
5  confused."  But that's not the way the UCC is set up at all.
6  It's supposed to be a blind.  You're supposed to able to look
7  at the public record and not be seriously misled.  And under
8  this case, looking at the documents that we've attached, it's
9  seriously misleading that the Secretary of State recorded the
10  financing statement as terminated.

11      THE COURT:  All right.  Thank you.

12      Mr. Pepler, very briefly, if you want to respond to
13  anything.

14      MR. PEPLER:  The Secretary of State has no
15  discretion to refuse a filing.  And the materially misleading
16  statement, I concede, continues in effect.  And I believe
17  that the financing statement as amended is not seriously
18  misleading and continues to perfect the security interest of
19  City National Bank.

20      THE COURT:  All right. I'm going to take this under
21  advisement.

22      I need a mechanism to know whether the sale closed.  Mr.
23  Kuhner, can I draft you to let me know at the close of
24  business Tuesday or opening of business Wednesday morning
25  whether the sale closed or not?  If it didn't close and they

1   -- I mean, obviously, we're urging the Court simply to deny
2   the motion and that the 87-1/2 percent proceeds just stay --
3   remain segregated so that we can bring a complaint to
4   determine the extent and validity of City National Bank's
5   liens.

6       We would ask for the same thing with respect to this
7   adequate protection payment.  We shouldn't be paying $60,000
8   in adequate protection to City National if in fact they don't
9   have an interest in cash collateral because their underlying
10  security interest was terminated.

11      Your Honor, just in terms of, you know, the context of
12  this, I have been following up with the Debtor as well as
13  with the bank, their counsel, regularly over the last couple
14  of weeks in terms of what was intended with respect to this
15  cash collateral stipulation that expired on June 30th.  At
16  first I didn't get any information, then I started to get
17  some communications that they were working on a stopgap kind
18  of a bare-bones budget to extend the period of authorized
19  cash collateral use through July 17th.

20      And then all of a sudden, you know, we get this budget
21  dropped on us yesterday that suddenly has a $60,000 adequate
22  protection payment to City National Bank.  You know, despite
23  repeated requests, we never got the budget until yesterday,
24  and I guess I understand from counsel that they're going to
25  put that over for notice.  I don't have any problem with that

1 | at all.

2 | Generally speaking, Your Honor, we're -- in terms of the
3 | status of the case, just to bring you up to speed, we have
4 | regularly tried to have communications with the Debtor about
5 | where the case is going, what's the exit strategy, what's the
6 | end game, is there going to be a reorganization plan here?
7 | And really, we've seen no progress at all in the case, other
8 | than this one pending sale, which I'm glad to hear is
9 | supposed to close very, very soon.

10 | We don't feel like the Debtor has been moving forward
11 | with a sufficient level of urgency or with a sufficient level
12 | of flexibility in terms of doing what needs to be done in
13 | order to try and realize value from the assets that are
14 | available in this estate.

15 | That's just to put it a little bit in perspective, Your
16 | Honor, just to give you a little bit of context. Again, we
17 | don't have any problem with the necessary expenditures that
18 | have to be made under this budget, but given where the Debtor
19 | stands today -- and it is somewhat precarious -- given our
20 | disputes, pending disputes with the liens asserted by City
21 | National Bank, we would urge the Court at a minimum to
22 | approve the cash collateral budget provided that the $60,000
23 | in adequate protection is segregated pending a determination
24 | of the validity of City National Bank's liens.

25 | THE COURT: All right. Thank you, Mr. Litvak. Mr.

1 Pepler, let me ask you this.

2      MR. PEPLER: Yes.

3      THE COURT: If I were to go along with the
4 suggestion made by the Committee about impounding the
5 $60,000, would there still be a -- is there still a
6 stipulation?

7      MR. PEPLER: I have made it clear to Mr. Litvak that
8 we would not consent unless we got the money. And I -- this
9 explains why the ruling on the issue of the continuing
10 validity of the lien is not advisory. Mr. Litvak raises this
11 in every possible context. It's the reason why we can't move
12 anything forward.

13    So, no, we would not consent to this -- to the continued
14 use of cash without receiving a payment of adequate
15 protection.

16      THE COURT: Mr. Kuhner, are there any expenses that
17 the Debtor needs to make between now and the close of
18 business Tuesday in order to avoid immediate and irreparable
19 injury to the estate?

20      MR. KUHNER: Mr. Nyberg has a better handle on that.

21      MR. NYBERG: I believe, Your Honor, the --

22      THE COURT: I need you behind a microphone, please.

23      MR. NYBERG: Eric Nyberg, Your Honor.

24    I think the only two would be one is payroll and the
25 other is rent. Because the rent is due on July 1st. I don't

1 know what the grace period is. It could be ten days. But I
2 would say that those would be the two: payroll and rent.

3         THE COURT: And when is the payroll?

4         MR. NYBERG: The payroll is July 3rd. It's
5 tomorrow. So it has to be --

6         MR. PEPLER: Your Honor, may I speak to the payroll?
7 I mean, the payroll has to be funded three days before the
8 pay date, and I agreed with Mr. Nyberg, notwithstanding what
9 I just said, that we didn't want to harm the employees and
10 that the bank would consent to the use of cash to pay the
11 payroll due July 3rd. So that's funded. But it was based on
12 the understanding that we would move forward and get this
13 cash collateral stipulation extension approved.

14         THE COURT: Well, what if you don't get it -- if
15 it's to be approved, and this isn't a ruling, if it's to be
16 approved, it isn't going to come before Tuesday. In that
17 case, is there still funds for the Debtor to make the
18 payroll?

19         MR. PEPLER: The payroll has already been funded,
20 Your Honor.

21         THE COURT: All right.

22         MR. PEPLER: It's -- the question is whether the
23 bank gets the benefits of the remaining adequate protection
24 components of the stipulation.

25         THE COURT: All right. I'll tell you what, Mr.

1 Nyberg. I have to take approval of the stipulation under
2 advisement. If it turns out that the bank is unsecured and I
3 so rule, we go one way. If the bank is secured, then I guess
4 I can approve the stipulation. And if there needs to be an
5 evidentiary hearing, which is what the Creditors' Committee
6 is pressing for, we'll just have to cross that when we get to
7 it.

8     As far as the rent goes, --

9     MR. NYBERG: We might be able to push that out,
10 because usually -- I mean, usually there is a grace period.
11 So --

12     THE COURT: All right.

13     MR. NYBERG: So if it's due on the 1st, I'm sure we
14 have a couple of days' grace. And with the holiday weekend,
15 hopefully people won't be watching too closely.

16     THE COURT: All right. All right. So if and to the
17 extent that Court approval is needed to authorize funding of
18 the payroll and related expense items -- you know, the
19 withholding and all those goodies -- that's approved. To the
20 extent that the Debtor is seeking a complete ratification of
21 the stipulation, I'll take that under submission as well.

22     MR. NYBERG: Thank you.

23     MR. PEPLER: Thank you.

24     MR. FELD: Your Honor?

25     THE COURT: Yes?

33

1          MR. FELD:  This is --

2          THE COURT:  Is that Mr. Litvak?

3          MR. FELD:  No, this is Alan Feld for CP III, another

4  secured creditor.

5          THE COURT:  Yes, Mr. Feld.  Yes?

6          MR. FELD:  Your Honor, I just wanted to state for

7  the record that we have no objection to the stipulation,

8  provided that we're afforded the same protections as in the

9  prior cash collateral agreement, including the monthly

10  payment, which I believe Mr. Nyberg has now budgeted as an

11  adequate protection payment.  We're -- we understand that

12  that, of course, is effective when and if the stipulation is

13  approved.

14      And we also, like Mr. Litvak, saw the stipulation and the

15  budget for the first time last night, so we're working with

16  Mr. Nyberg on signing off on that.

17          THE COURT:  All right.

18          MR. KUHNER:  And that's correct, Your Honor.

19          THE COURT:  All right.  Mr. Kuhner -- I don't know

20  if you heard Mr. Kuhner.  He confirms your understanding.

21          MR. FELD:  Okay.  Thank you very much.

22          THE COURT:  All right.  Any other business before

23  the Court?

24      (No response.)

25          THE COURT:  All right.  We may need to schedule some

34

1 | hearings next week, depending on what happens. But at this

2 | point, I think I'll just wait to see if the sale closes, and

3 | I will undertake to respond to a closing as quickly as I

4 | possibly can after that closing.

5 |                MR. KUHNER: Thank you, Your Honor.

6 |                MR. PEPLER: Thank you, Your Honor.

7 |                THE COURT: All right. Thank you all.

8 |                (Proceedings concluded at 3:24 p.m.)

9 |                          --oOo--

10

11

12

13

14

15

16

17

18 |                          CERTIFICATE

19 |       I certify that the foregoing is a correct transcript

20 | from the electronic sound recording of the proceedings in the

21 | above-entitled matter.

22 |                 *Kathy Rehling*    Digitally signed by Kathy Rehling
                                       DN: cn=Kathy Rehling, c=US, email=kathy.rehling@tx.rr.
23 |                                    com
                                       Date: 2009.08.26 22:22:04 -05'00'

24 | Kathy Rehling                                          Date
   | Certified Electronic Court Transcriber
25 | CET**D-444

35

1                                    INDEX

2
     PROCEEDINGS                                                        3
3
     WITNESSES
4
     EXHIBITS
5
     RULINGS
6
7    - Trial Schedule                                                   8
     - Motion Taken Under Advisement                                   23
8    - Approval of Payroll Expenses                                    32
     - Cash Collateral Stipulation Taken Under Advisement              32
9
     END OF PROCEEDINGS                                                34
10
     INDEX                                                             35
11
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Form TRANSC

## UNITED STATES BANKRUPTCY COURT
### Northern District of California

**In re Debtor(s):**

A.F.Evans Company, Inc.

Case No.: 09–41727 EDJ 11
Chapter: 11

## NOTICE OF FILING OF TRANSCRIPT
## AND DEADLINES RELATED TO RESTRICTION AND REDACTION

A transcript of the proceeding held on 7/2/2009 was filed on Wednesday, August 26, 2009. The following deadlines apply:

The parties have until Tuesday, September 8, 2009 to file with the court a Notice of Intent to Request Redaction of this transcript. The deadline for filing a request for redaction is Wednesday, September 16, 2009.

If a request for redaction is filed, the redacted transcript is due Monday, September 28, 2009.

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is Tuesday, November 24, 2009, unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber,

Kathy Rehling
Kathy Rehling Transcripts
209 Bay Circle
Coppell, TX 75019

or you may view the document at the clerk's office public terminal.

Dated: 8/31/09

For the Court:

Gloria L. Franklin
Clerk of Court
United States Bankruptcy Court

# Notice Recipients

| District/Off: 0971−4 | User: twilliams | Date Created: 8/28/2009 |
| Case: 09−41727 | Form ID: TRANSC | Total: 76 |

**Recipients submitted to the BNC (Bankruptcy Noticing Center) without an address:**

| cr | CP III Evans, LLC |
| intp | Donald Engle |
| crcm | Committee of Creditors of A.F. Evans Company, Inc. |
| op | Alliant Tax Credit XVII, Inc. |
| op | Alliant Tax Credit Fund XVII, Ltd. |
| op | Alliant Tax Credit XVI, Inc. |
| op | Alliant Tax Credit Fund XVI, Ltd. |
| cr | Market Square Homeowners Association |
| cr | California Mortgage and Realty, Inc. |
| cr | CharterMac Corporate Partners XXXIII, L.P. |
| aty | Sheppard, Mullin, Richter &Hamption LLP |
| br | Ricki Heck of Colwell Banker Commercial, GR |
| cr | Arthur F. Evans |
| cr | Madera West Condominium Association |

TOTAL: 14

**Recipients of Notice of Electronic Filing:**

| ust | Office of the U.S. Trustee/Oak | USTPRegion17.OA.ECF@usdoj.gov |
| aty | Alan E. Ramos | aramos@lawnrs.com |
| aty | Austin P. Nagel | melissa@apnagellaw.com |
| aty | Chris D. Kuhner | c.kuhner@kornfieldlaw.com |
| aty | Eric A. Nyberg | e.nyberg@kornfieldlaw.com |
| aty | Frank T. Pepler | fpepler@peplermastromonaco.com |
| aty | Gregg M. Ficks | gficks@coblentzlaw.com |
| aty | Howard J. Weg | hweg@pwkllp.com |
| aty | Jeffrey A. Krieger | jkrieger@ggfirm.com |
| aty | Jeffrey D. Trowbridge | jdt3656@sbcglobal.net |
| aty | Kathryn S. Diemer | kdiemer@diemerwhitman.com |
| aty | Margaret M. Mann | mmann@sheppardmullin.com |
| aty | Mark V. Isola | misola@rehonroberts.com |
| aty | Maxim B. Litvak | mlitvak@pszjlaw.com |
| aty | Pamela E. Singer | psinger@pszyjw.com |
| aty | Philip S. Warden | philip.warden@pillsburylaw.com |
| aty | Randy Michelson | randy.michelson@michelsonlawgroup.com |
| aty | Randy R. Rogers | rrogers@winston.com |
| aty | Robert A. Abrams | rabrams@katskykorins.com |
| aty | Robert B. Kaplan | rbk@jmbm.com |
| aty | Robert S. Gebhard | robert.gebhard@sdma.com |
| aty | Steven G.F. Polard | spolard@perkinscoie.com |
| aty | T. Scott Bucey | sbucey@peplermastromonaco.com |
| aty | Todd C. Toral | ttoral@nixonpeabody.com |
| aty | William E. Adams | wadams@fablaw.com |
| aty | William F. McLaughlin | mcl551@aol.com |
| aty | Zachary Mosner | bcumosner@atg.wa.gov |

TOTAL: 27

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| db | A.F.Evans Company, Inc. | 1000 Broadway, Ste 300 | Oakland, CA 94607 |
| cr | Union Bank, N.A. | Jeffer, Mangels, Butler &Marmaro LLP | Robert B. Kaplan | Two Embarcadero |
| | Center | 5th Floor | San Francisco, CA 94111 |
| cr | City National Bank | Pepler Mastromonaco LLP | Frank T. Pepler | 100 First Street, 25th Fl. | San |
| | Francisco, CA 94105 |
| cr | MW Housing Partners III, LP | Steven G. Polard | Perkins Coie LLP | 1620 26th Street | 6th Floor, |
| | South Tower | Santa Monica, CA 90404 |
| aty | Kornfield, Nyberg, Bendes &Kuhner, PC | 1999 Harrison St. #2675 | Oakland, CA 94612 |
| intp | Engle Development Services, Inc. | 1221 Broadway, 21st Floor | Oakland, CA 94612 |
| cr | Central Valley Community Bank | Attention: Patrick Carman | 60 W. 10th Street | Tracy, CA 94537 |
| cr | TW Telecom, Inc. | 10475 Park Meadows Drive #400 | Littleton, CO 80124 |
| cr | Affordable Housing Playa Del Alameda, LLC | c/o Nixon Peabody LLP | Attn: Todd C. Toral | One |
| | Embarcadero Center | 18th Floor | San Francisco, CA 94111−3600 |
| cr | Affordable Housing Oak Center, LLC | c/o Nixon Peabody LLP | Attn: Todd C. Toral | One |
| | Embarcadero Center | 18th Floor | San Francisco, CA 94111−3600 |
| cr | Affordable Housing MORH I Housing, LLC | c/o Nixon Peabody LLP | Attn: Todd C. Toral | One |
| | Embarcadero Center | 18th Floor | San Francisco, CA 94111−3600 |
| cr | MMA Pioneer Plaza, LLC f/k/a Lend Lease Pioneer Park Plaza, LLC | c/o Nixon Peabody LLP | Attn: Todd |
| | C. Toral | One Embarcadero Center | 18th Floor | San Francisco, CA 94111−3600 |

| cr | Affordable Housing Eastshore Manor I, LLC | c/o Nixon Peabody LLP | Attn: Todd C. Toral | One |
| | Embarcadero Center | 18th Floor | San Francisco, CA 94111−3600 | |
| cr | Washington State Tax Agencies | c/o Office of the Attorney General | 800 5th Ave., Suite 2000 | Seattle, |
| | WA 98104−3188 | | | |
| cr | U.S. Bank National Association | Winston &Strawn LLP | 101 California St. | San Francisco, CA 94111 |
| aty | Heritage Bank of Commerce | Sedgwick,Detert,Moran &Arnold LLP | One Market Plaza,Steuart Tower,8th |
| | Floor | San Francisco, CA 94105 | | |
| cr | Arnold E. Brown | Apex Real Estate | 32 Washington Avenue | Point Richmond, CA 94801 |
| cr | Promenade Housing Corporation | c/o Gregg M. Ficks, Esq. | Coblentz, Patch, Duffy &Bass LLP | 1 |
| | Ferry Bldg, #200 | San Francisco, CA 94111 | | |
| cr | Case Avenue Housing Corporation | c/o Gregg M. Ficks, Esq. | Coblentz, Patch, Duffy &Bass LLP | 1 |
| | Ferry Bldg, #200 | San Francisco, CA 94111 | | |
| cr | Citizens Housing Corporation | c/o Gregg M. Ficks, Esq. | Coblentz, Patch, Duffy &Bass LLP | 1 Ferry |
| | Bldg, #200 | San Francisco, CA 94111 | | |
| cr | Segue Construction, Inc. | c/o Diemer, Whitman &Cardosi, LLP | 75 E. Santa Clara Street | Suite |
| | 290 | San Jose, CA 95113 | | |
| crcm | Pachulski Stang Ziehl &Jones LLP | 150 California St. | 15th Floor | San Francisco, CA 94111−4500 |
| cr | The Regents of the University of California | Michelson Law Group | 150 Spear Street, Suite 1600 | San |
| | Francisco, CA 94105 | | | |
| cr | Hudson Housing Capital, LLC | c/o Howard J. Weg | Peitzman, Weg &Kempisky LLP | 10100 Santa |
| | Monica Blvd. #1450 | Los Angeles, CA 90067 | | |
| cr | AICCO, Inc. | c/o Philip S. Warden | Pillsbury Winthrop Shaw Pittman LLP | 50 Fremont |
| | Street | San Francisco, CA 94105 | | |
| cr | CharterMac Corporate XXXII SLP LLC | c/o Katsky Korins LLP | 605 Third Avenue | New York, NY |
| | 10158 | | | |
| cr | Centerline Corporate Partners XXXII LP | c/o Katsky Korins LLP | 605 Third Avenue | New York, NY |
| | 10158 | | | |
| cr | CharterMac Corporate XXXIII SLP LLC | c/o Katsky Korins LLP | 605 Third Avenue | New York, NY |
| | 10158 | | | |
| acc | Kawamoto, Weil and Company | 150 E. Campbell Ave., Suite 201 | Campbell, CA 95008 | |
| cr | Federal Home Loan Mortgage Corporation | 8200 Jones Branch Drive | McLean, VA 22102 | |
| cr | Nissan−Infiniti LT | c/o Austin P. Nagel, Esq. | 111 Deerwood Road | Suite 388 | San Ramon, CA |
| | 94583 | | | |
| cr | Sparknight dba Trans Pacific Centre | 111 Sutter Sutter Street, Suite 350 | San Francisco, CA 94104 | |
| aty | Alan M. Feld | Manatt, Phelps and Phillips | 11355 W Olympic Blvd. | Los Angeles, CA 90064−1614 |
| aty | Mark P. Levy | Levy, Levy and Levy | 900 Larkspur Landing Circle #275 | Larkspur, CA 94939 |
| aty | Robert M. Bone | Law Offices of Robert M. Bone | 37 Old Courthouse Sq. #200 | Santa Rosa, CA |
| | 95404 | | | |

TOTAL: 35